1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ECOLOGICAL RIGHTS FOUNDATION,

                    Plaintiff,

          v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY,

                    Defendant.

Case No. 20-cv-06898-SI

**ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 30, 31

Before the Court are cross summary judgment motions filed by the parties in this Freedom of Information Act ("FOIA") dispute.  Defendant U.S. Environmental Protection Agency ("EPA") moves for summary judgment on whether it properly invoked Exemption 5 in withholding various records in response to a ten-part FOIA request from plaintiff Ecological Rights Foundation ("EcoRights").  Dkt. No. 30.  EcoRights cross-moves for summary judgement on the same issue, and also requests this Court to issue declaratory and injunctive relief to address EPA's alleged FOIA violations in this case and in others (i.e., a "pattern or practice" claim).  Dkt. No. 31.  For the reasons set forth below, the Court **GRANTS** defendant EPA's summary judgment motion and **DENIES** plaintiff EcoRights' summary judgment motion.

# BACKGROUND

## A. EcoRights Submits its FOIA Request

Supplemental Environmental Projects, or SEPs, are environmentally beneficial projects or activities voluntarily undertaken by environmental law violators as part of a settlement with the EPA. Wilcox Decl., Dkt. No. 31-1 ¶ 3. SEPs are often directed at remedying the localized harms caused by a violator's conduct. *Id*. The EPA's use of SEPs in settlement agreements is guided by a 2015 Policy Update. Porter Decl., Dkt. No. 30-1 ¶ 3. On August 21, 2019, however, the DOJ issued a memorandum constraining the use of SEPs in certain types of judicial enforcement cases. *Id*. That memo is entitled "Using Supplemental Environmental Projects ('SEPs') in Settlements with State and Local Governments" (hereafter "2019 SEP Memo"). *Id*.

On October 16, 2019, EcoRights sent a ten-part FOIA request to the EPA seeking records related to the new 2019 SEP Memo. Dkt. No. 30-2 (FOIA Request); Porter Decl., Dkt. No. 30-1 ¶ 3. EcoRights says that it sought the records to determine EPA's involvement in developing the 2019 SEP Memo, EPA's opinion of the 2019 SEP Memo, EPA's implementation of the 2019 SEP Memo, and the reception of the 2019 SEP Memo by state and local governments and other entities. Wilcox Decl., Dkt. No. 31-1 ¶ 3. "The FOIA request also sought information more generally about attempts to limit SEPs from EPA and DOJ since Donald Trump took office to determine the origins of this change and the bases for the earlier, less sweeping incursions on the use of SEPs under the Trump Administration." *Id*. This included, according to EcoRights, two U.S. Department of Justice ("DOJ") memoranda authored by former Attorney General Jeff Sessions: (1) "Prohibition on Settlement Payments to Third Parties" ("2017 Sessions Memo") and (2) "Principles and Procedures for Civil Consent Decrees and Settlement Agreements with State and Local Government Entities" ("2018 Sessions Memo"). *Id*. ¶ 4. The FOIA request is reproduced below:

EcoRights hereby requests copies of the following records, from the Environmental Protection Agency ("EPA"). Note that these records are requested **starting from January 20, 2017, President Trump's inauguration date, and continuing up to and including the date that EPA issues a determination for this request, including records postdating the August 21, 2019 memorandum discussed below**:

1   United States District Court
Northern District of California

1. All communications between EPA and U.S. Department of Justice ("DOJ") concerning DOJ's August 21, 2019 memorandum entitled "Using Supplemental Environmental Projects ("SEPs") in Settlements with State and Local Governments."

2. All communications between EPA and DOJ concerning use of SEPs in lieu of civil penalties or as a factor to consider in reducing civil penalties.

3. All communications between EPA and DOJ concerning limiting and/or eliminating the use of SEPs in settlements with state and/or local governments.

4. All communications between any EPA staff members concerning limiting and/or eliminating the use of SEPs in settlements with state and/or local governments.

5. All communications between EPA and any state and/or local governments concerning limiting and/or eliminating the use of SEPs in settlements with state and/or local governments.

6. All communications from state and local governments providing their opinion, comments, suggestions, ideas, position, and/or any statement on limiting and/or eliminating the use of SEPs in settlements with state and/or local governments.

7. All records providing instructions or guidance or posing questions or raising issues or potential problems with implementation of the memorandum limiting and/or eliminating the use of SEPs in settlements with state and/or local governments.

8. All records posing or stating questions, concerns, comments, or ideas from EPA staff concerning implementation of the memorandum limiting and/or eliminating the use of SEPs in settlements with state and/or local governments.

9. All correspondence between EPA and/or DOJ and any defendant, including officers, elected officials, attorneys, consultants, or staff members employed by state or local governments, in a judicial enforcement case for violations of the Clean Water Act, Clean Air Act, Resource Conservation and Recovery Act, or Safe Drinking Water Act related to SEPs in settlement negotiations. For example, correspondence between EPA and/or DOJ and the City of Houston (including officers, elected officials, attorneys, consultants, or staff members employed by or representing Houston) related to SEPs and concerning settlement negotiations and/or settlement of the Clean Water Act case against Houston discussed here: https://www.justice.gov/opa/pr/houston-texas-agrees-implementcomprehensive-measures-aimed-eliminating-sanitary-sewer-0.

10. Any communications between DOJ and/or EPA and any member or members of Congress concerning limiting and/or eliminating the use of SEPs in settlements with state and/or local governments, including but not limited to

communications concerning whether America's Water Infrastructure Act of 2018, P.L. 115-270, 132 Stat. 3765, affected the legality of using SEPs in settlements with state and/or local governments.

Dkt. No. 30-2 at 1–2 (emphasis in original).

**B. EPA Responds and the Parties Discuss the Request**

Under FOIA, an agency must provide a "determination" with respect to any request within 20 days of receiving the request (or 30 days, in exceptional circumstances). 5 U.S.C. § 522(a)(6)(A)(i)-(ii). "A 'determination' need not be the full production of documents, but at a minimum the agency must inform the requester what documents it will produce and the exceptions it will claim in withholding documents." *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1089 (N.D. Cal. 2015).

On November 8, 2019, three days before the 20-day deadline, EPA wrote back to EcoRights stating that the request was too broad to be completed within 20 days and that the request did not reasonably describe the records in a way that would permit EPA employees to identify and locate them. Porter Decl., Dkt. No. 30-1 ¶ 4. The EPA thus sought clarification of the request and an extension of time to respond, noting that the request was tolled until EcoRights could provide clarification. *Id.* EcoRights asserts that it did not promptly receive the November 8, 2019 letter at that time. Wilcox Decl., Dkt. No. 31-1 ¶ 7. EcoRights thus emailed EPA one week later, on November 15, 2019, stating EPA had violated FOIA's deadline. Porter Decl., Dkt. No. 30-1 ¶ 5.

On November 20, 2019, one day after an unsuccessful attempt to reach EcoRights via phone, EPA wrote back to EcoRights and attached the November 8, 2019 letter. Dkt. No. 31-4. The parties eventually conferred via phone on November 27, 2019 to discuss the request. Porter Decl., Dkt. No. 30-1 ¶ 6. A follow up email sent from EPA to EcoRights on December 3, 2019 memorialized the proposed revised scope of the FOIA request. Ex. 5, Dkt. No. 30-6. The revised plan included using Boolean searching (i.e., using keywords) and dividing potential records custodians into three groups: A, B, and C. Porter Decl., Dkt. No. 30-1 ¶ 7. EcoRights responded to the follow up email on December 12, 2019, agreeing with some, but not all, of the proposed revisions. Ex. 4, Dkt. No. 31-5. For example, EcoRights believed the use of keywords alone would "include many records

1  that are not relevant while also missing many relevant records," and instead proposed discussing the

2  FOIA request with the individual custodians.  *Id*.  In that letter, EcoRights also accepted EPA's

3  "proposal for a follow-up call on January 8, 2020 at 3pm Eastern to discuss EPA's progress on the

4  FOIA request and to determine whether we can continue resolution of this request informally."  *Id*.

5  at 7.  EPA asserts it began its search of the records after receipt of the December 12, 2019 letter.

6  Porter Decl., Dkt. No. 30-1 ¶ 9, 10, 11 (detailing initial search efforts).

7      The call took place as scheduled on January 8, 2020.  *Id*. ¶ 12.  EPA updated EcoRights on

8  the ongoing search and shared its reservations regarding EcoRights' proposal to solicit records

9  directly from individual custodians, but indicated that it would proceed in that way if EcoRights

10  wanted to do so.  *Id*.  EPA provided an estimated completion and production date of June 8, 2020,

11  with potential rolling productions, and invited EcoRights to follow up on whether it would like the

12  agency to prioritize certain records or set a more definitive production schedule.  *Id*.  On January

13  17, 2020, EcoRights informed EPA that it was still determining how to best address the FOIA

14  request and would reach out in the future.  *Id*. ¶ 13.

16  **C. EPA Produces Records and EcoRights Files Suit**

17      On May 12, 2020, EPA made its first production, producing 44 records in full and 69 with

18  redactions, and withholding 14 records in full and 74 in part.  *Id*. ¶ 15. Ex. 5, Dkt. No. 31-6 at 2.  In

19  that production letter, EPA provided an updated estimated completion date of September 1, 2020 or

20  sooner.  Dkt. No. 31-6 at 3.  The second production, on August 19, 2020, included a release of 71

21  records released in full and 165 with redactions, and the withholding of 159 records.  Porter Decl.,

22  Dkt. No. 30-1 ¶ 16; Wilcox Decl., Dkt. No. 31-1 ¶ 14.  EPA provided an updated estimate of October

23  15, 2020 for completion, citing the large volume of records and the need for interagency

24  consultation.  Porter Decl., Dkt. No. 30-1 ¶ 16.  A third production occurred on October 6, 2020,

25  including 181 records released in full and 432 released with redactions, and withholding in part 609

26  records.  Dkt. No. 31-8 at 2.

27      By the time EPA produced its third batch of records, EcoRights had already filed the present

28  lawsuit, seeking declaratory and injunctive relief for EPA's alleged FOIA violations.  Dkt. No. 1

United States District Court
Northern District of California

5

(Complaint filed October 2, 2020).

The fourth and final production took place on November 16, 2020.  Wilcox Decl., Dkt. No. 31-1 ¶ 17.  In total, across all productions, EPA had withheld 447 records in full based on two FOIA exemptions, produced 1,827 records in full or with redactions, and referred 142 records to DOJ for an independent response from that agency.  Dkt. No. 31-9 at 2; Porter Decl., Dkt. No. 30-1 ¶ 20.

**D. The Parties Attempt to Settle**

After the fourth production in November 2020, EcoRights and EPA attempted to settle EcoRights' claims regarding the withholdings.  Porter Decl., Dkt. No. 30-1 ¶ 21.  EPA's deadline to respond to the present lawsuit was extended three times to facilitate negotiations.  Wilcox Decl., Dkt. No. 31-1 ¶ 18.  EPA filed its answer on April 20, 2021.  Dkt. No. 21.

In the midst of these negotiations, DOJ rescinded the 2019 SEP Memo—the policy that constrained the use of SEPs and formed the primary basis for EcoRights' FOIA request.  Ex. 14, Dkt. No. 30-15 (DOJ memo rescinding 2019 SEP Memo on February 4, 2021).  Over the phone on February 12, 2021, EPA explained to EcoRights that DOJ had withdrawn the 2019 SEP memo.  Porter Decl., Dkt. No. 30-1 ¶ 22.  EcoRights stated that the withdrawal of the 2019 SEP memo did not change its position in the present litigation.  *Id*.

Starting in mid-2021, EPA re-reviewed its prior productions.  Porter Decl., Dkt. No. 30-1 ¶ 23, 24.  These efforts resulted in rolling re-productions of records with updated withholding and redactions, which took place on: June 7, 2021; June 30, 2021; September 30, 2021; October 5, 2021; and November 16, 2021.  *Id*. ¶ 23; Wilcox Decl., Dkt. No. 31-1 ¶ 20, 21, 22, 24.  EcoRights declares that "[d]espite EPA removing well over 1,300 improper redactions from the records it had produced during the conferral process, the parties continue to dispute many redactions and withholdings of records made under Exemption 5."  Wilcox Decl., Dkt. No. 31-1 ¶ 26.  EcoRights also asserts that "EPA has a pattern or practice of violating FOIA."  *Id*.

**E. EPA and EcoRights Move for Summary Judgment**

On November 17, 2021, EPA moved for summary judgment on the issue whether it had satisfied all of its obligations with respect to EcoRights' FOIA request and that the information at issue was properly withheld pursuant to Exemption 5, codified at 5 U.S.C. § 552(b)(5). Dkt. No. 30. Exemption 5 permits withholdings pursuant various privileges, including, but not limited to, the deliberative process privilege, the attorney client privilege, and the attorney work product privilege.

At the time EPA filed its motion, 644 documents remained at issue. Porter Decl., Dkt. No. 30-1 ¶ 29. To facilitate the Court's assessment of the lawfulness of EPA's withholdings, EPA submitted, in conjunction with a declaration from an agency employee with personal knowledge of the records at issue, a *Vaughn* Index that categorizes similar records into eight categories of withholdings. Dkt. Nos. 31-1 (Porter Decl.), 31-23 (*Vaughn* Index). The *Vaughn* Index also purports to addresses the foreseeable harm associated with each individual withheld record.

EcoRights filed its cross-motion for summary judgment on December 17, 2021. Dkt. No. 31. EcoRights asks this Court to issue (1) an injunction requiring EPA to produce records it had unlawfully withheld and desist from violating FOIA's deadlines or unlawfully withholding nonexempt records in the future, and (2) a declaratory judgment that EPA violated FOIA's deadlines, unlawfully withheld records, and has a pattern of practice of violating FOIA. *Id*.

In the motion, EcoRights asserts that it, as well as others similarly situated, "have experienced pervasive delays in EPA responding to FOIA requests well beyond statutory deadlines." Dkt. No. 33-1 at 33. EcoRights submits a declaration describing previous "extreme" delays in getting EPA to comply with six FOIA requests EcoRights submitted through 2017 and 2018. Evenson Decl., Dkt. No. 31-47 ¶ 9-12; Sproul Decl., Dkt. No. 31-48 ¶ 3-5.

EcoRights also submitted a declaration from another nonprofit, Outreach for Our Children's Earth Foundation ("OCE"), which described EPA's delays of 44, 64, and 64 days in responding to three FOIA requests sent by the OCE in 2021. Beaman Decl., Dkt. No. 31-49 ¶ 5-12. The OCE declaration also details EPA's failure to comply with requests in 2008 due to an alleged "backlog." *Id*. ¶ 9. EcoRights submitted various other declarations from other organization. *See* Lam Decl., Dkt. No. 31-42 (detailing EPA's delays in responding to Environmental Integrity Project's eleven

FOIA requests); Brown Decl., Dkt. No. 31-43 (detailing EPA's delay in responding to Center for Biological Diversity's six FOIA requests submitted since 2019); Hartl Decl. Dkt. No. 31-44 (similar); Parent Decl., Dkt. No. 31-45 (similar, detailing four additional examples of delays).

On May 12, 2022, the Court ordered the parties to submit supplemental briefing after the Ninth Circuit issued its decision in *Transgender L. Ctr. v. Immigr. & Customs Enf't*, 33 F.4th 1186, 1196 (9th Cir. 2022) ("*TLC*"). Dkt. Nos. 44, 47, 48.

## LEGAL STANDARD

### A. The FOIA Framework

"Upon request," the Freedom of Information Act "mandates disclosure of records held by a federal agency" unless disclosure is prohibited by law or the requested records fall within the statute's nine exemptions enumerated in 5 U.S.C. § 552(b). *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7–8 (2001). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is [FOIA's] dominant objective." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). An agency wishing to avail itself of a FOIA exemption must provide, in response to a FOIA request, "tailored reasons" why an exemption applies. *Shannahan v. I.R.S.*, 672 F.3d 1142, 1148 (9th Cir. 2012). Boilerplate or conclusory statements will not suffice. *Id.* The FOIA Improvement Act of 2016 further strengthened FOIA's preference for disclosure by requiring that agency seeking to avail itself of an exemption articulate why it is reasonably foreseeable that disclosure would "harm an interest protected" by the exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I).[1]

---

[1] In a recent case, the District of Columbia gleaned "three key principles" from the few cases that have addressed the "new foreseeable-harm requirement." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019). First, "the foreseeable-harm requirement 'impose[s] an independent and meaningful burden on agencies.'" *Id.* (quoting *NRDC v. EPA*, No. 17-CV-5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019)). Second, meeting this burden requires an agency to "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect[ ] the harms in [a] meaningful way to the information withheld." *Id.* (quoting *Jud. Watch, Inc. v. U.S. Dep't of Just.*, No. CV 17-0832 (CKK), 2019 WL 4644029, at *5 (D.D.C. Sept. 24,

1    Even if an exemption applies to a document, FOIA instructs that a "reasonably segregable

2   portion of a record shall be provided to any person requesting such record after deletion of the

3   portions which are exempt under this subsection."  5 U.S.C. § 552(b).  "[I]t is reversible error for

4   the district court to simply approve the withholding of an entire document without entering a finding

5   on segregability, or the lack thereof, with respect to that document."  *TLC,* 33 F.4th at 1196 (quoting

6   *Hamdan v. U.S. Dep't of Just.*, 797 F.3d 759, 779 (9th Cir. 2015)).  The court "must make a specific

7   finding that no information contained in each document or substantial portion of a document

8   withheld is segregable."  *Hamdan*, 797 F.3d at 779.  To do so, a district court need not "take on the

9   role of document clerk, reviewing each and every document an agency withholds… [the] court may

10  rely on an agency's declaration in making its segregability determination."  *Id*.

11

12  **B. FOIA's Exemption 5**

13    Exemption 5, used by the EPA in the present case, permits agencies with withhold inter-

14  agency or intra-agency memorandums or letters "which a private party could not discover in

15  litigation with the agency."  5 U.S.C. § 552(b)(5); *NLRB v. Sears, Roebuck & Co*., 421 U.S. 132,

16  148 (1975).  "[T]his exemption incorporates the privileges available to Government agencies in civil

17  litigation.  That list includes the deliberative process privilege, attorney-client privilege, and attorney

18  work-product privilege."  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.,* 141 S. Ct. 777, 785 (2021).

19

20    **1. Deliberative Process Privilege.**

21    The deliberative process privilege shields from disclosure "documents 'reflecting advisory

22  opinions, recommendations and deliberations comprising part of a process by which governmental

23  decisions and policies are formulated.'"  *NLRB*, 421 U.S. at 150 (quoting *Carl Zeiss Stiftung v. v.

24  E. B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (DC 1966)).  To qualify for the deliberative process

25  privilege, a document must be both "predecisional" and "deliberative."  *TLC*, 33 F.4th at 1196.

26

27  2019)).  Third, agencies "may take a categorical approach" and "group together like records."  *Id*.

28  (quoting *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018).

United States District Court
Northern District of California

A documents is predecisional if it is "antecedent to the adoption of agency policy." *Id*. (quoting *Nat'l Wildlife Fed'n v. U.S. Forest Serv*., 861 F.2d 1114, 1117 (9th Cir. 1988)). *See also Renegotiation Bd. v. Grumman Aircraft Eng'g Corp*., 421 U.S. 168, 184 (1975) (distinguishing between "predecisional memoranda prepared in order to assist an agency decisionmaker in arriving at his decision, which are exempt from disclosure, and postdecisional memoranda setting forth the reasons for an agency decision already made, which are not.").

A document is deliberative only if it is actually "related to the process by which policies are formulated.'" *TLC*, 33 F.4th at 1196 (quoting *Nat'l Wildlife Fed'n*, 861 F.2d at 1117). A court should find a document is deliberative if "disclosure of materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Id*. (quoting *Assembly of the State of Cal. v. Dep't of Commerce*, 968 F.2d 916, 921 (9th Cir. 1992)). The deliberative process privilege has been applied to "recommendations, draft documents, proposals, suggestions and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency," as well as documents which would "inaccurately reflect or prematurely disclose the views of the agency." *Nat'l Wildlife Fed'n*, 861 F.2d at 1118-19 (quoting *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir.1980)). Importantly, merely designating a document a "draft" does "not automatically make it privileged" under the deliberative process privilege. *Id*. (quoting *Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1, 14 (D.D.C. 2004)). To properly withhold drafts, the agency must still articulate how disclosure would reveal a deliberative process. *Id*.

### 2. Attorney-Client Privilege.

The attorney-client privilege applies to documents in the FOIA context when (1) "the information in [the] documents was communicated to or by an attorney as part of a professional relationship," (2) "the information is confidential," and (3) the "communication is based on confidential information provided by the client." *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 279 F. Supp. 3d 121, 146 (D.D.C. 2017). An agency seeking to avail itself of the attorney-

client privilege for withheld documents must, "at the very least, (1) describe with sufficient particularity the nature of the legal issue or issues for which advice was sought; (2) explain whether the communications sought legal advice, conveyed legal advice, or both; and (3) provide evidence that the communications were confidential." *Id.* at 152. The attorney-client privilege protects confidential communications and seeks to "encourage clients to make full disclosure to their attorneys." *Fisher v. United States*, 425 U.S. 391, 403 (1976).

### 3. Work-Product Privilege.

The work-product privilege "protects the integrity of adversarial proceedings by allowing attorneys to prepare their thoughts and impressions about a case freely and without reservation." *Am. C.L. Union of N. California v. United States Dep't of Just.*, 880 F.3d 473, 484 (9th Cir. 2018) (citing *Hickman v. Taylor*, 329 U.S. 495, 498 (1947)). "To qualify for work-product protection, documents must: (1) be 'prepared in anticipation of litigation or for trial' and (2) be prepared 'by or for another party or by or for that other party's representative.'" *U.S. v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011). *See, e.g., Delaney, Migdail & Young, Chartered v. I.R.S.*, 826 F.2d 124, 127 (D.C. Cir. 1987) (affording work-product privilege to IRS memos drafted to "advise the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome.").

### C. Evaluating FOIA Exemptions on Summary Judgment

A federal court reviews an agency's response to a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B). "Because facts in FOIA cases are rarely in dispute, most such cases are decided on motions for summary judgment." *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012) (citation omitted), overruled on other grounds by *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 989 (9th Cir. 2016). Summary judgment is appropriate "only if the agency can prove 'that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester.'" *James Madison Project v. Dep't of Just.*, 302 F. Supp. 3d 290, 295 (D.D.C. 2018). Thus, an agency bears

1    the burden of establishing the adequacy of its search for records responsive to a FOIA request.

2    *Zemansky v. U.S.E.P.A.*, 767 F.2d 569, 571 (9th Cir. 1985).

3        To prevail on summary judgment on whether an exemption applies, an agency is "typically

4    required to submit an index and 'detailed public affidavits' that, together, 'identify[ ] the documents

5    withheld, the FOIA exemptions claimed, and a particularized explanation of why each document

6    falls within the claimed exemption." *Yonemoto*, 686 F.3d at 688.  Those affidavits, typically referred

7    to as a *Vaughn* Index, must "describe the justifications for nondisclosure with reasonably specific

8    detail, demonstrate that the information withheld logically falls within the claimed exemptions, and

9    show that the justifications are not controverted by contrary evidence in the record or by evidence

10   of [agency] bad faith." *TLC,* 33 F.4th at 1196 (quoting *Hunt v. CIA*, 981 F.2d 1116, 1119 (9th Cir.

11   1992)). "Specificity is the defining requirement."  *Id.* (quoting *Wiener v. FBI*, 943 F.2d 972, 979

12   (9th Cir. 1991)).  A *Vaughn* index "riddled with 'boilerplate or conclusory statements'" will not

13   suffice.  *Id.* (finding the *Vaughn* Index inadequate where the agency "provided copy-and-pasted

14   generic descriptions in five of six total entries invoking FOIA Exemption 5").

15       Importantly, an agency's FOIA affidavits, such as a *Vaughn* Index, "are presumed to be in

16   good faith," *TLC*, 33 F.4th at 1195 (quoting *Hamdan,* 797 F.3d at 768), and should be accorded

17   "substantial weight" by the reviewing court. *Shannahan,* 672 F.3d at 1148; *Civ. Beat L. Ctr. for the*

18   *Pub. Int., Inc. v. Centers for Disease Control & Prevention*, 929 F.3d 1079, 1087 n. 4 (9th Cir.

19   2019).  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient [to prevail

20   on summary judgment] if it appears 'logical' or 'plausible.'"  *Transgender L. Ctr,* 2020 WL

21   7382113, at *7 (quoting *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007)) (rev'd on other grounds

22   in *TLC*, 33 F.4th 118).

23

24   **D. Equitable Relief in FOIA Cases**

25       "[U]nreasonable delays in disclosing non-exempt documents violate the intent and purpose

26   of the FOIA, and the courts have a duty to prevent these abuses."  *Long v. U.S. I.R.S.*, 693 F.2d 907,

27   910 (9th Cir. 1982); *Animal Legal Def. Fund v. United States Dep't of Agric.*, 935 F.3d 858, 873

28   (9th Cir. 2019) ("our circuit has recognized that courts are the 'enforcement arm' of FOIA, meaning

United States District Court
Northern District of California

1   we have 'the responsibility of ensuring the fullest responsible disclosure.'")  To enforce FOIA, a

2   district court "may consider injunctive relief where appropriate." *Long*, 693 F.2d at 909.  The "prime

3   consideration" for a district court considering injunctive relief "should be the effect on the public of

4   disclosure or nondisclosure." *Id*.  The district court should also "seriously consider the likelihood

5   of recurrence, weighing the good faith of any expressed intent to comply, the effectiveness, if any,

6   of the discontinuance and the character of past violations." *Id*.

7       In some cases, courts have also found declaratory judgments appropriate "when the agency

8   has a pattern and practice of violating [FOIA's] time limits [...] or when the agency has violated the

9   time limits in responding to a particular set of requests, the agency's violations are consistent, and

10   they may recur." *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv*., No. 14-1130 SC,

11   2015 WL 6331268 at *7 (N.D. Cal. Oct. 21, 2015).  A "FOIA pattern or practice claim can be

12   established through evidence of chronic delay and backlogs." *Nightingale v. U.S. Citizenship &

13   Immigr. Servs*., 507 F. Supp. 3d 1193, 1201 (N.D. Cal. 2020), appeal dismissed sub nom. 2021 WL

14   3674656 (9th Cir. July 30, 2021) (citing *Our Children's Earth Found.*, 2015 WL 6331268 at *8).

15

16                            **DISCUSSION**

17

18   **A. Application of FOIA Exemption 5 to Withheld Records**

19       To determine whether EPA is entitled to summary judgment on the applicability of

20   Exemption 5, the Court evaluates the submitted affidavits and *Vaughn* Index attached to the motion.

21   Unless otherwise rebutted, the affidavits are accorded substantial weight and entitled to a

22   presumption of good faith, and will carry EPA's burden if sufficient detail is included to permit the

23   Court to conclude that the withheld information "logically falls" within the claimed exemption.

24   *TLC*, 33 F.4th at 1196.  Here, the Court finds it appropriate to take the EPA's *Vaughn* Index at "face

25   value," as it contains sufficiently detailed entries.  *Hamdan*, 797 F.3d at 779.  Further, "there is

26   ample evidence that the [EPA]  has acted in good faith in its dealings … including re-reviewing

27   materials for release... ." *Id*.

28       The Court relies on EPA's eight-part categorical organization of the contested records.

United States District Court
Northern District of California

13

### 1. Category 1: EPA Penalties - *Vaughn* Nos. 1–26

Category 1 includes internal discussions between EPA and DOJ attorneys on how to calculate and adjust penalties based on the merits of a given enforcement case.  Porter Decl., Dkt. No. 30-1 ¶ 30; *Vaughn* Nos. 1–26.  EPA asserts the records in Category 1 are properly withheld pursuant to the deliberative process, attorney-client, and attorney work-product privileges of Exemption 5.  EcoRights does not dispute that EPA was justified in withholding penalty recommendations which were not ultimately adopted by the agency.  Dkt. No. 33-1 at 12 (EcoRights MSJ).  Instead, EcoRights challenges EPA's withholding of the "final SEP amounts" reached in enforcement cases.

EPA, however, argues that nothing in Category 1 contains "final SEP amounts" – a point which EcoRights does not dispute in its responsive briefing.  Having reviewed the entries in the *Vaughn* Index for Category 1 (Nos. 1 – 26) and the accompanying declaration, the Court concludes that none of the withheld records in Category 1 contain final SEP amounts, such that there is no genuine dispute whether the Category 1 documents were properly withheld.

### 2. Category 2: Case-Specific Settlement Discussions - *Vaughn* Nos. 97–196

Category 2 includes documents containing case-specific settlement approval and briefing memoranda, and emails discussing the same, prepared by regional attorneys and enforcement personnel for purposes of seeking EPA management approval to enter into settlement agreements on particular terms.  Porter Decl., Dkt. No. 30-1 ¶ 34; *Vaughn* Nos. 97–196.  EPA withheld documents in Category 2 pursuant to deliberative process, attorney-client, and attorney work-product privileges on the grounds that the withheld information "reflects recommendations or opinions developed by or at the direction of government attorneys related to decision-making in ongoing litigation."  Porter Decl., Dkt. No. 30-1 ¶ 36, 37-39.

EcoRights only challenges the withholding of records that pertain to resolved enforcement litigation, i.e., "recommendations that were accepted concerning whether to approve the SEPs at issue."  Dkt. No. 33-1 at 12-13.  In EcoRights' view, a record that "embod[ies] a final decision" cannot protected by the deliberative process privilege.  *Id*.  "The accepted recommendations,"

EcoRights argues, "embody the decision here and mark the end of deliberations." Dkt. No. 38 at 11 (EcoRights Reply). EPA, however, declares that the "withheld communications and drafts in Category 2 are comprised of recommendations regarding SEPs and other terms in settlements that were made prior to the relevant consent decree approvals." Porter Decl., Dkt. No. 30-1 ¶ 39.

The Court accepts EPA characterization of the records and finds the deliberative process privilege logically applies. EcoRights is correct that the deliberative process privilege only applies to documents that (1) "were generated before the agency's final decision on the matter," and (2) "were prepared to help the agency formulate its position." *Sierra Club, Inc*., 141 S. Ct. at 786 ("once a decision has been made, the deliberations are done."). But even if the recommendations at issue were later incorporated into the final consent decrees produced by EPA,[2] the recommendations, when drafted, did not reflect "a final agency decision and the reasons supporting it," or reflect "the 'consummation' of the agency's decisionmaking process." *Id*. at 786. Only approved consent decrees carry real operative effect and represent EPA's final view on an enforcement matter. Porter Supp. Decl., Dkt. No. 37-1 ¶ 2. Recommendations drafted before the issuance of consent decrees in order to assist EPA to formulate its settlement plans reflect a "'merely tentative' position" on which EPA decisionmakers are "free to change their minds." *Sierra Club*, 141 S. Ct. at 786. The contested records in Category 2 thus plausibly fall within the deliberative process privilege even if those records contain recommendations which may have been integrated into a final decision.

EPA has also established that it is reasonably foreseeable that harm would result from the disclosure of predecisional recommendations for settlements. 5 U.S.C. § 552(a)(8)(A)(i)(I). The EPA believes disclosure would "chill discourse regarding SEPs in the context of internal deliberations regarding the terms of the proposed settlements." Porter Decl., Dkt. No. 30-1 ¶ 39. "Regardless of whether the recommendations [were accepted], disclosure of the specific back-and-forth discussion…will offer defendants in similarly situated cases a window into government decision-making in environmental cases." *Id*. The EPA has accordingly met its burden under FOIA

---

[2] EcoRights asserts the contested records cannot be predecisional because EPA failed to provide a date of the relevant decisions. The relevant decision here would be a court's approval of a consent decree. EPA has produced consent decrees for every case at issue, which include the relevant dates of approval. Porter Decl., Dkt. No. 30-1 ¶ 35.

United States District Court
Northern District of California

1   for Category 2.

2

3   **3. Category 3: Correspondence and Material Related to Ongoing Litigation -** *Vaughn*

4   **Nos. 197–225**

5           Category 3 consists of 29 documents that contain internal meeting materials, including

6   emails and attachments, prepared by EPA in preparation for meetings between EPA and DOJ in

7   which the two agencies discussed ongoing environmental enforcement cases and EPA's concerns

8   and recommendations on the impacts of potential changes to SEPs policy.  Porter Decl., Dkt. No.

9   30-1 ¶ 40; *Vaughn* Nos. 197–225.  EPA asserts the deliberative process, attorney-client, and attorney

10  work-product privileges apply to the documents in Category 3 because (1) the documents contain

11  predecisional deliberations that predated the issuance of and were associated with the 2019 SEP

12  Memo, *id*. ¶ 43, (2) that the documents contain attorney analysis of ongoing environmental

13  enforcement litigation and the impact that contemplated policy would have on those cases, *id*. ¶ 41,

14  and (3) the documents constitute communications between attorneys at various agencies.

15          EcoRights asserts that EPA mischaracterizes the documents in Category 3.  Rather than

16  preparing EPA for meetings in which it deliberated the upcoming 2019 SEP Memo, EcoRights

17  insists EPA created the withheld documents to discuss with DOJ: (1) the then-already-issued 2018

18  Sessions Memo and its effects on SEPs in general, (2) EPA's 2015 SEP Policy, and (3) examples of

19  past SEPs.  Wilcox Decl., Dkt. No. 31-1 ¶ 49-55.  As evidence of EPA's alleged misrepresentation,

20  EcoRights directs the Court's attention to Exhibit 28 for *Vaughn* 243, a draft "thank-you" email sent

21  between participants at a June 4, 2019 meeting, which states: "I want to thank you again for meeting

22  with me on Thursday to discuss Attorney General Sessions' Principles and Procedures for Civil

23  Consent Decrees and Settlement Agreements with State and Local Governmental Entities

24  (November 2018) and how that policy relates to EPA's SEP practice."  Ex. 28, Dkt. No. 31-28.  In

25  response, EPA states that the "discussions of contemplated changes to enforcement policy will

26  necessarily be informed by some discussion of past and current policies."  Dkt. No. 37 at 16-17.

27          The Court is not persuaded that the thank-you email offered by EcoRights adequately rebuts

28  the presumption of good faith afforded to EPA's declaration that the withheld records contain

United States District Court
Northern District of California

16

predecisional deliberations that ultimately culminated in the 2019 SEP Memo.  EcoRights is correct that the deliberative process privilege only protects documents "prepared to assist an agency decision-maker in arriving at a future particular decision," not documents prepared in the course of a perpetual "process of agency self-examination."  *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 981 (9th Cir. 2009).  However, the principle expressed in *Lahr* only held that "the agency must *identify a specific decision* to which the document is predecisional."  *Maricopa Audubon Soc. v. U.S. Forest Serv.*, 108 F.3d 1089, 1094 (9th Cir. 1997) (emphasis added).  EPA has carried that burden here by attesting that the withheld documents were predecisional to the 2019 SEP Memo, even if the discussions referenced an already-issued memo on the same topic.  The Court has reviewed the additional *Vaughn* entries challenged by EcoRights, 197-211, 212, 214, 215, 216, 218, 218, 221-25, and concludes EPA has provided sufficient detail in the *Vaughn* Index and Porter Declaration to establish the plausibly application of Exemption 5 and the foreseeable harm associated with disclosure.

### 4. Category 4: Correspondence and Material for EPA/DOJ SEP Meetings - *Vaughn* Nos. 226–257

Unlike the records in Category 3, the records in Category 4 do not reference ongoing enforcement litigation, but only reference the proposed changes to SEP practice and the broader interagency discussion concerning enforcement policy prior to the issuance of the 2019 SEP Memo. Porter Decl., Dkt. No. 30-1 ¶ 44-46; *Vaughn* Nos. 226–257.  EPA asserts the records are protected by the deliberative process and attorney-client privileges.  For the same reasons as Category 3, the Court finds Category 4 documents subject to the deliberative process privilege.

### 5. Category 5: Communications on Application of SEP Policy to Specific EPA Cases - *Vaughn* Nos. 258–467

Category 5 consists of 210 documents that contain communications within EPA and between EPA and DOJ that discuss the agencies' SEP policies and practices and the application of SEP policies and practices to specific EPA enforcement cases ongoing at the time.  Porter Decl.,

United States District Court
Northern District of California

1  Dkt. No. 30-1 ¶ 47; *Vaughn* Nos. 258–467.  EPA asserts the records in Category 5 are protected by

2  the deliberative process, attorney-client, and attorney work-product privileges.

3       EcoRights does not challenge the redactions of records containing discussions of settlement

4  strategy in specific enforcement cases.  Dkt. No. 33-1 at 23.  Instead, EcoRights only seeks the

5  production of information relating to: (1) the effects of the 2018 Sessions Memo and 2019 SEP

6  Memo on SEPs generally, (2) application of these withdrawn memos to specific completed cases,

7  and (3) communications conveying a final decision on whether and why an SEP was allowed in a

8  given case.  *Id*.  EcoRights believes such information is redacted across eighteen records.  Wilcox

9  Decl., Dkt. No. 31-1 ¶¶ 69, 70, 71.  According to EcoRights' reading of the *Vaughn* Index, the

10  following *Vaughn* entries "appear[]" to contain information that post-dates the 2018 Sessions Memo

11  and relate to the implementation of the 2018 Sessions Memo to SEPs generally: 261, 284, 285, 286,

12  288, 296, 322, and 467.  *See id*. ¶ 72–79 (challenging each indexed record individually).  Similarly,

13  EcoRights believes the following *Vaughn* entries might contain information that post-dates the 2019

14  SEP Memo and relate to the implementation of the 2019 Sessions Memo to SEPs generally: 397,

15  398, 399, 400, and 450. See *id*. ¶ 80–81 (same).  Finally, EcoRights believes the following *Vaughn*

16  entries may contain information conveying a final decision on whether an SEP will be allowed in a

17  specific case: 287, 298, 350, 351, 359, 395, 426.  *See id*. ¶ 82–87 (same).

18       The Court first reiterates that, to prevail on summary judgment, an agency need only

19  establish that the justification for invoking a FOIA exemption appears logical, which it may achieve

20  through affidavits that describe the justification with reasonable specificity.  *Hamdan,* 797 F.3d at

21  769, 774.  Only if the agency's proffered justification is "controverted by contrary evidence in the

22  record or by evidence of [agency] bad faith" will the Court conduct an *in camera* review to resolve

23  factual disputes as to the content of the withheld records.  *Id*. at 769.

24       With the applicable legal standard in mind, the Court has carefully reviewed each of the

25  Category 5 records contested by EcoRights, as well as the assertions made in EcoRights' briefings

26  and the Wilcox Declaration.  Having carefully reviewed *Vaughn* Nos. 261, 284, 285, 286, 287, 288,

27

28
                                        18

296, 298, 306, 307, 313, 314, 315, 322, 350, 351, 359, 395, 397, 398, 399, 400, 426,[3] 450, and 467, the Court concludes EPA has met its burden to establish a logical justification for the specific withholdings.

EcoRights' repeated assertions of what the withheld or redacted materials "appear" to contain (e.g., Wilcox Decl., Dkt. No. 31-1 ¶ 73, 74, 75, 76, 77, 81, 86, 87) does not amount to "contrary" record evidence sufficient to rebut the veracity of the *Vaughn* Index. Further, EcoRights' allegations that several contested Category 5 *Vaughn* entries are "inaccurate" because they "describe only the last email in the chain" or "do not identify all of the recipients of the emails," (*e.g.*, *id.* ¶ 72, 73, 74, 75, 76, 77, 78, 80, 82), even if true, do not establish agency "bad faith" or a failure to describe the withheld contents with *reasonable* specificity.

As to *Vaughn* numbers 397 through 400 in particular—which EcoRights argues in supplemental briefing as containing non-predecisional and purely factual material, Dkt. No. 47 at 3—the Court finds EPA has carried its burden to articulate why these withheld documents are subject to the deliberative process privilege. According to the *Vaughn* Index, *Vaughn* Nos. 397-400 pertain to an email exchange entitled "SEP follow up" in which EPA and DOJ attorneys discuss "how DOJ's August 2019 SEPs policy *will be applied* to active enforcement matters that EPA had open against defendants at the time." (emphasis added). These emails are thus plausibly predecisional to the actions EPA intends to take in pending enforcement maters. The documents are also deliberative, in that "they are composed of recommendations regarding settlement terms and other litigation strategy exchanged between members of the case team." Dkt. No. 30-1 at 28.

EPA has met its burden to establish the applicability of Exemption 5 to Category 5.

---

[3] EcoRights submits a copy of *Vaughn* 426 as Exhibit 34. Dkt. No. 31-34. The exhibit contains an email exchange of two emails sent on subsequent days. EcoRights argues the *Vaughn* entry is "inaccurate because it only supplies a description of the [second] email," and fails to explain why the subject line in the second email was redacted. Wilcox Decl., Dkt. No. 31-1 ¶ 87. The Court is unpersuaded.

The *Vaughn* index describes the first email: "The *first email* in this chain from Staff Attorney Caroline Makepeace to several other OECA attorneys reflects OECA staff working to draft language and gather materials in support of that discussion with DOJ." Dkt. No. 30-23 (emphasis added). Further, it makes sense that, having redacted and explained the redaction of the subject line in the first email, EPA likely deemed it unnecessary to discuss the redaction of the subject line in the second email, as responses tend to retain the same subject line as the initial message in the thread.

1      **<u>Category 6: Attorney Communications Regarding SEP Policy</u>**- *Vaughn* **Nos. 468–596**

2          Category 6 consists of 129 documents that EPA alleges contain advice from EPA and DOJ

3      attorneys regarding SEP policy generally, rather than SEP policy in connection with specific

4      enforcement cases.  Porter Decl., Dkt. No. 30-1 ¶ 51.  EPA asserts that the records concern the

5      development of the 2019 SEP Policy, and are thus protected by the deliberative process privilege.

6      *Id.* ¶ 53.  EPA also asserts the records are attorney-client privileged.  *Id.* ¶ 52.

7          EcoRights contests over seventy records in Category 6 on the following three grounds.  Dkt.

8      No. 33-1 at 23 (EcoRights Motion).  First, EcoRights believes the following *Vaughn* entries cannot

9      be pre-decisional because they all postdate or embody the relevant policy decisions, namely, the

10     2018 Sessions Memo, the 2015 SEP Policy Memo, and past consent decrees that included SEPs:

11     470–73, 474–511, 514, 515, 525, 526, 529, 533, 537, and 538.  Wilcox Decl., Dkt. No. 31-1 ¶ 89,

12     90.  Second, EcoRights believes the following *Vaughn* entries are contemporaneous with or postdate

13     the 2019 SEP Memo: 561–64, 569–71.  *Id.* ¶ 91, 92.  Third, EcoRights believes the following

14     *Vaughn* entries are mere draft press statements that do not also formulate policy, and are thus

15     nonexempt: 540–43, 545–49, 551, 553, 555, 572–74.  *Id.* ¶ 93.

16         The Court has carefully reviewed each of the Category 6 records contested by EcoRights, as

17     well as the assertions made in the briefings and Wilcox Declaration, and concludes that EPA has

18     demonstrated the claimed exemption logically applies to each withholding or redaction.  The only

19     record evidence offered by EcoRights to rebut EPA's affidavits is Exhibit 35, containing the

20     redacted document described in *Vaughn* No. 471. Dkt. No. 31-35.  The Court surmises that

21     EcoRights offers Exhibit 35 to demonstrate that *Vaughn* Nos. 470-73 were communications

22     pertaining to the 2018 Sessions Memo, rather than the 2019 SEP Memo to be issued later that year.

23     But even if it were true that EPA staff were discussing the 2018 Sessions Memo, this does not

24     preclude the application of the deliberative process privilege to *Vaughn* Nos. 470–73, as discussions

25     pertaining to past SEP policy may be predecisional to the "specific decision" of what a subsequent

26     SEP policy will entail.  *Maricopa Audubon Soc.*, 108 F.3d at 1094.

27         As to *Vaughn* No. 515—identified in EcoRights' supplemental briefing, Dkt. No. 47 at 4—

28     the Court finds the *Vaughn* entry sufficient to support the application of the attorney client privilege.

The document at *Vaughn* No. 515 contains two redactions: advice from a staff attorney on how to address a question about SEP policy and its impact on enforcement cases, and a response from an OECA administrator regarding that staff attorney's proposed advice.  The attorney client privilege is plausibly asserted, as the *Vaughn* entry describes with particularity the nature of the legal issue for which advice is sought, that the communication sought and conveyed legal advice, and that the chain was not shared broadly beyond those who needed to know of its contents.  *Ctr. for Biological Diversity*, 279 F. Supp. 3d at 152.

The Court has individually reviewed the remaining *Vaughn* entries contested by EcoRights and concludes that EPA has carried its burden to establish that Exemption 5 applies for Category 6.

### 7. Category 7: Attorney Communications Regarding Earlier DOJ Memoranda - *Vaughn* Nos. 597–618

The records in Category 7 are communications between EPA and DOJ that contain recommendations and advice concerning the application of the Sessions Memoranda to potential settlement terms in specific enforcement matters.  Porter Decl., Dkt. No. 30-1 ¶ 54.  EPA withheld Category 7 pursuant to the deliberative process, attorney-client, and attorney work-product privileges.

For this category, EcoRights only challenges "EPA's redaction of information relating to the effects of the Sessions Memoranda on SEPs generally and whether these memoranda mandate dropping or instead allow SEPs in specific cases."  Dkt. No. 33-1 at 24.  EcoRights argues that such information, which would post-date the Sessions Memoranda, could not be predecisional.  Dkt. No. 33-1 at 24.  EcoRights concedes that "discretionary attorney analysis" on how the Sessions Memoranda affect SEPs in certain cases would be properly withheld, but argues that, *if* the redactions contain statements that merely "convey the nondiscretionary instructions embodied in the 2018 Sessions Memo," withholding would not be appropriate.  Finding itself unable to discern from the *Vaughn* Index whether the redactions contain discretionary attorney advice or the conveyance of nondiscretionary instructions, EcoRights requests an *in camera* review.

EPA responds that the withheld material in Category 7 relates to specific case-related

decisions, and not to policy discussions leading up to the Sessions Memoranda.  Porter Decl., Dkt. No. 30-1 ¶ 57.  Because Category 7 is "composed of draft materials and back-and-forth discussions concerning proposed settlement terms in specific ongoing litigation [which would constitute the relevant final decision]," EPA insists the records are entitled to protection under the deliberative process privilege.  The Court agrees.

Review of the relevant *Vaughn* entries for Category 7 indicates the redactions contain staff discussions on how the Sessions Memoranda would apply to specific enforcement decisions which took place before those enforcement decisions became final.  While it is true that the *Vaughn* Index does not make clear whether the redactions contain statements that convey "nondiscretionary instructions," a remote possibility that a redaction might contain some type of non-exempt material does not suffice to rebut an agency's detailed affidavit and create a disputed issue of fact.  *Cf. Mil. Audit Project v. Casey*, 656 F.2d 724, 751–52 (D.C. Cir. 1981) ("'Discovery is not warranted [in FOIA cases] "when it appears that discovery would only ... afford [the plaintiff] an opportunity to pursue a bare hope of falling upon something that might impugn the affidavits.").

The Court has also reviewed the three Exhibits EcoRights submitted to contest the propriety of EPA's Category 7 withholdings.  Exhibit 36 contains the email referenced in *Vaughn* No. 608, Dkt. No. 31-36, which EPA describes as "an email from a DOJ attorney to an OCE attorney, proposing language for inclusion in a note from EPA to DOJ, following a meeting between the two agencies to discuss the 2018 AG Sessions memo on settlements with state and local governments." Dkt. No. 30-32 at 625.  EcoRights argues the withheld information in *Vaughn* No. 608 "appears to be purely factual" because the sentence preceding the redacted portion of the email states: "We reviewed our settlements with state and local government entities over the last eight years, and summarize them below."  Wilcox Decl., Dkt. No. 31-1 ¶ 96.

EcoRights' takes the quoted sentence out of context. Exhibit 36 indicates that the quoted sentence, and the redaction that followed, are part of a draft letter included within a correspondence between two attorneys. The sender (a DOJ attorney) was seeking feedback on the draft letter from the recipient (an OCE attorney):

**From**:      Dworkin, Karen (ENRD) [Karen.Dworkin@usdoj.gov]
**Sent**:      5/1/2019 7:24:53 PM
**To**:       Makepeace, Caroline [Makepeace.Caroline@epa.gov]
**Subject**: draft

Caroline — I need to turn to the examples; the last paragraph needs work (not that the first is that great either!)

Dear —

Thank for meeting with us yesterday, and providing an explanation of Attorney General Sessions' Principles and Procedures for Civil Consent Decrees and Settlement Agreements with State and Local Governmental Entities and how that policy relates to EPA's SEP practice. I also appreciated your willingness to think further about these issues even as you prepare to depart DOJ. As you do, I thought it would be useful to provide you with more detail about our municipal consent decrees and the types of SEP projects that have been included in those settlements. We reviewed our settlements with state and local government entities over the last eight years, and summarize them below.

# [Redacted per Ex. 5 AC/DP]

Ex. 36, Dkt. No. 31-36.  EcoRights has thus not offered contrary evidence to rebut the privileges asserted for *Vaughn* No. 608, as that email solicits legal advice on how to best present facts.

EcoRights' Exhibit 37 also does not provide contrary evidence that would call into question the justification offered for *Vaughn* No. 618, which EPA asserts is protected by the deliberative process, attorney client, and attorney work product privileges.  Dkt. No. 30-23 at 635.  EPA describes *Vaughn* 618 as "a powepoint [*sic*] presentation prepared by a legal intern for the Office of Civil Enforcement, presenting her legal research on the applicability of the 2017 Sessions Memorandum Prohibiting Settlement Payments to Third Parties to EPA's SEP Practice to attorneys within the agency." Dkt. No. 30-32.  The relevant excerpts from Exhibit 37, the record described at *Vaughn* No. 618, are reproduced below:



EPA notes that only one slide has been withheld in-part (right), and the "only other withheld material are speaker notes drafted by the legal intern" that "reflect conversations with Agency attorneys concerning ongoing litigation." Dkt. No. 30-23 at 635. EcoRights argues the withheld slide "appears to be a factual interpretation of the effects of the 2017 Sessions Memo." Wilcox Decl., Dkt. No. 31-1 ¶ 100. As the Court has previously explained, bare assertions of what a redacted record might contain does not constitute contrary evidence to rebut a sufficiently detailed *Vaughn* entry. EcoRights also takes issue with the redacted presentation notes, stating that EPA "has provided insufficient information to determine whether the presentation notes in this record contain similar factual information." *Id*. The EPA's burden, however, is only to describe the record with reasonable specificity to permit this Court to evaluate whether an exemption plausibly applies. EPA has adequately explained the presentation notes were drafted by a legal intern at the direction of agency attorneys and describe ongoing litigation. It is thus logical that the attorney work product privilege applies to the presentation notes.

Finally, EcoRights submits Exhibit 38, which contains the emails referenced in *Vaughn* No. 603, Dkt. No. 31-38, for which EPA asserts deliberative process, attorney-client, and attorney work product privileges, as well as the personal privacy privilege of Exemption 6. Dkt. No. 30-23 at 619. EcoRights remarks that for *Vaughn* No. 603, EPA asserts the attorney work product privilege but "does not invoke the attorney work product exemption anywhere" in the *Vaughn* description. Wilcox Decl., Dkt. No. 31-1 ¶ 101. EcoRights is correct. However, EPA adequately asserts that two other Exemption 5 privileges, as well as an Exemption 6 privilege, logically apply to *Vaughn* No. 603.

**8. Category 8: Correspondence And Drafts Related to Congressional Communications - *Vaughn* Nos. 619–644**

The records in Category 8 consist of draft letters prepared by the EPA's Office of Enforcement and Compliance Assurance ("OECA") in response to a Congressional inquiry from Senator Tom Carper in 2018, who requested advice on environmental topics including notices of violation, certain consent decrees, and analysis of EPA and DOJ policy, including the 2017 Sessions Memoranda.  Porter Decl., Dkt. No. 30-1 ¶ 58; *Vaughn* Nos. 619–644.  E PA asserts the "fifteen drafts of this letter that are withheld reflect the back-and-forth between staff in OECA regarding how best to counsel on the framing of legal issues in response to Senator Carper's inquiry as the draft language was developed."  *Id*. ¶ 60.  EPA contends that the withheld drafts are subject to the deliberative process privilege because they reflect an exchange of "views concerning how best to frame responses to anticipated questions on environmental enforcement topics, and those recommendations and views represent the varying opinions on how to address the topics at issue."  *Id*.  EPA also asserts attorney-client privilege.

EcoRights argues the deliberative process privilege cannot apply because the drafts, created in 2018, discuss the 2017 Sessions Memo, and thus, cannot be predecisional to that 2017 memorandum.  Dkt. No. 33-1 at 25.  EPA maintains the "final decision" relevant to the asserted privilege was not the 2017 Sessions Memo, but the decision of what to put in the final letter sent to Senator Collins in response to his inquiry.  Given that the drafts predated and deliberated the contents of the final letter to Senator Collins, EPA argues it may properly utilize the deliberative process privilege here.  The Court agrees.  The Court recognizes the Ninth Circuit's decision in *TLC* states that "[g]overnment 'deliberations regarding how best to address public relations matters or possible responses to an inquiry received from an outside entity are not the type of policy decisions the privilege is intended to protect.'"  33 F.4th at 1198 (quoting *Al Otro Lado, Inc. v. Wolf,* No. 3:17-cv-2366-BAS-KSC, 2020 WL 6449152, at *4 (S.D. Cal. Nov. 2, 2020)).  However, the Ninth Circuit's decision did not address whether deliberations on how to respond to inquiries received from Congress fall outside the intended scope of the deliberative process privilege.  Accordingly, the Court applies the background principle that in order to withhold a draft communication, an

agency must "adequately explain[] how they reveal a deliberative process." *TLC*, 33 F.4th at 1198. EPA has carried that burden with respect to the draft letters to Senator Collins. *See, e.g.*, *Vaughn* No. 620 (describing a six-month long back and forth deliberative process in which the final draft differed "significantly" from prior drafts, such that "produc[tion] [of the] unfinished drafts that substantially differ from the final result undermines the Agency's ultimate communication to congress and will create confusion as to the Agency's position on key enforcement issues.").

In the alternative, EcoRights argues that the deliberative process privilege "includes only policy development, not explanation." Dkt. No. 38 at 18 (EcoRights Reply). The Ninth Circuit, however, rejects the position that a document "must itself contain recommendations on law or policy to qualify as 'deliberative.'" *Nat'l Wildlife Fed'n*, 861 F.2d at 1118. Here, the substance of the draft letters, according to EPA, embodied a deliberative process on how to best counsel a member of Congress anticipating questions on environmental enforcement topics. *Id*. (quoting *Montrose Chemical Corp. of California v. Train*, 491 F.2d 63, 71 (D.C. Cir.1974)) (remarking that exemption 5 "was intended to protect not simply deliberative *material*, but also the deliberative *process* of agencies."). EPA declared that "letters that are sent to Congress are carefully crafted by attorneys and staff at EPA because they communicate EPA's positions on issues of broad impact and importance, in this case enforcement matters that apply to specific cases and more generally at EPA." Porter Decl., Dkt. No. 30-1 ¶ 60. Disclosure, according to EPA, "would chill EPA staff's ability to confer regarding questions received from Congress on this topic that is of significant interest to the public and to legislators." *Id*. The Court thus finds EPA properly applied Exemption 5 to Category 8.

### 9. Segregability Determination

The Court has scrutinized EPA's segregability determinations for each entry in the *Vaughn* Index, and finds each entry sufficiently individualized and specific as to permit the Court to find that all reasonably segregable factual information has been produced. *TLC*, 33 F.4th at 1200. As to non-segregable information, EPA's *Vaughn* Index sufficiently sets forth "clear, precise, and easily reviewable explanations" for why information was withheld pursuant to an articulated privilege. *Id*.

Where factual information is expressly withheld, the EPA's *Vaughn* Index articulates with specificity why the withheld "factual material ... is so interwoven with the deliberative material that it is not severable." *Id.* (quoting *FTC v. Warner Comms., Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984)); *See Vaughn* Nos. 1, 22–26, 29-32, 47–50, 60, 61, 67-70, 87–89, 92, 103, 106–110, 115–117, 138, 140, 147–165, 167–178, 188–200, 213, 215, 216, 218, 219, 226, 232, 236, 237–241, 252, 253, 259, 277, 281, 289–293, 299–301, 322, 324, 326, 333, 334, 338, 343, 345, 367, 383, 408–411, 414, 454–457, 463–467, 491–495, 499, 504, 514, 556–560, 608.[4]

**B. Equitable Relief**

**1. Request for Injunction**

EcoRights asks the Court to enter an injunction requiring EPA to produce records it had unlawfully withheld and desist from violating FOIA's deadlines or unlawfully withholding nonexempt records in the future. Because the Court has determined that EPA's withholdings are proper under Exemption 5, the Court declines to order EPA to produce the withheld records.

The Court will also decline to issue an injunction ordering EPA to comply with FOIA's deadlines and disclosure requirements in this case. The "primary consideration" for injunctive relief is the "effect on the public of disclosure or nondisclosure." *Long,* 693 F.2d at 909. Even though the 2019 SEP Policy which prompted EcoRights' FOIA request has since been rescinded, the public retains an interest in non-exempt agency records pertinent to that policy's development and subsequent demise. However, the other equitable factors weigh against issuing injunctive relief here. The facts demonstrate that EPA, in good faith, promptly responded to EcoRights' FOIA request and conveyed a willingness to cooperate before the expiry of the 20-days deadline. Porter Decl., Dkt. No. 30-1 ¶ 4. Over the coming months, EPA and EcoRights engaged in frequent discussions over how to address the expansive ten-part FOIA request. There is no indication that

---

[4] *Vaughn* No. 619 does not contain a segregability statement. EPA notes, however, that No. 619 is not at issue in this case. ("The only information withheld is pursuant to Ex. 6 which Plaintiff does not challenge. This document was inadvertently categorized as at issue, but it is not, and the mistake could not be corrected in time for filing."). EcoRights did not contest this statement.

United States District Court
Northern District of California

1   EPA deliberately caused needless delay, and it appears EcoRights was a willing participant in the

2   ongoing discussions.  See Ex. 4, Dkt. No. 31-5 at 7 (EcoRights writing to tell EPA it is accepting

3   EPA's "proposal for a follow-up call on January 8, 2020 at 3pm Eastern to discuss EPA's progress

4   on the FOIA request and to determine whether we can continue resolution of this request

5   informally.").  *Id*. at 7.

6          The Court also cannot conclude that EPA's timeline for the production of the documents,

7   given the expansiveness of EcoRights' ten-part FOIA request, amounted to an "unreasonable

8   delay[]" justifying injunctive relief.  *Long*, 693 F.2d at 910.  EcoRights directly participated in

9   shaping how the document search would take place, including objecting to EPA's customary

10   practice to use Boolean search terms to sift through voluminous records, and instead insisting that

11   EPA solicit records directly from individual custodians.  Porter Decl., Dkt. No. 30-1 ¶ 12.  Although

12   EPA's initial production in May 2020 could have been more prompt, the Court notes that,

13   throughout the process, EPA kept EcoRights up to date on the ongoing search and provided updates

14   on estimated completion dates as well as rolling productions.

15

16          **2. Request for Declaratory Judgment**

17          EcoRights also asks this Court to issue a declaratory judgment that EPA violated FOIA's

18   deadlines, unlawfully withheld records, and has a pattern of practice of violating FOIA.  In support

19   of its request, EcoRights submits various affidavits from employees of EcoRights and other

20   environmental advocacy organizations detailing EPA's delays in responding to FOIA requests.

21   Evenson Decl., Dkt. No. 31-47 ¶ 9-12; Sproul Decl., Dkt. No. 31-48 ¶ 3-5; Beaman Decl., Dkt. No.

22   31-49 ¶ 5-12; Lam Decl., Dkt. No. 31-42; Brown Decl., Dkt. No. 31-43; Hartl Decl. Dkt. No. 31-

23   44; Parent Decl., Dkt. No. 31-45.  These declarations primarily refer to FOIA requests filed between

24   2017 and 2020.  The Beaman declaration refers to events in 2008.

25          EcoRights also presents evidence that EPA had a backlog of 2,272 FOIA requests at the end

26   of fiscal year 2019.  Exhibit 1, Dkt. No. 38-1.  "This is 489 requests more than at the end of fiscal

27   year 2020."  Supp. Wilcox Decl., Dkt. No. 38-1 ¶ 10, citing Dkt. No. 37-5 at 21 (Chief FOIA Officer

28   Report 2021).  Further, EcoRights notes the ratio of backlogged requests to number of requests was

United States District Court
Northern District of California

nearly identical in both 2019 and 2020, with 2020 seeing a .13% decrease in the backlog ratio. Exhibit 1, Dkt. No. 38-1 at 19.  Relying on the same set of facts, EPA responds that its backlog of FOIA requests decreased by nearly 500 cases, or 21.35% between 2019 and 2020.  Exhibit 4, Dkt. No. 37-5.  The EPA's 2021 FOIA Chief Officer Report also describes the steps EPA had taken since 2020 to reduce backlog:

> For FY 2020, each region and headquarters FOIA program office set office-specific annual goals and targets to reduce the backlog of overdue FOIA requests aligned with the agency-wide goal. Office-specific FOIA backlog reduction annual goals and monthly targets have been set for FY 2021, aligned with the Agency's FY 2018-22 Strategic Plan goal to eliminate the Agency's FOIA backlog by end of FY 2022.

*Id*. at 23.  The Chief Officer Report also describes how EPA is "exploring options for increasing proactive disclosure of certain record categories that frequently contain requested records, in order to increase the availability of these records to the public" and reduce the number of FOIA requests received, and thus, reduce the ongoing backlog. *Id*.

Based on these facts, the Court cannot conclude that declaratory judgment is appropriate. Although EcoRights submits several declarations describing EPA's delay in responding to FOIA requests between 2017 and 2020, it is undisputed that EPA's backlog of FOIA requests has decreased over the last two fiscal years for which data is available.  *See Nightingale,* 507 F. Supp. 3d at 1201–02 (issuing declaratory judgment against DHS where backlog increased "from 16,247 in FY 2015 to 25,446 in August 2020," with "more than 6,000 cases between June and August 2020.").  The record also demonstrates EPA is taking concrete steps to continue reducing its backlog. *See id*. (declaratory judgment proper where "defendants continue[d] to rely on a patchwork of short-term fixes—overtime, staff detailed from other departments, and contract support—none of which has succeeded in the long-term").

To the extent EPA had a pattern or practice in failing to promptly respond to FOIA request at the time the declarants submitted their FOIA requests, the record suggests that the situation is improving.  *See Our Children's Earth Found.,*2015 WL 6331268, at *8 (issuing declaratory

judgment where plaintiffs provided the court "a reasonable basis to believe" the agency's FOIA "infractions will be ongoing."). The Court accordingly declines to issue declaratory judgment in this case.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant EPA's motion for summary judgement and **DENIES** plaintiff EcoRights' motion for summary judgment.


**IT IS SO ORDERED**.

Dated: June 15, 2022

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California